# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FETCH INTERACTIVE TELEVISION LLC and CHARLES SIEMONSMA, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2017-0637-SG |
| TOUCHSTREAM TECHNOLOGIES INC., d/b/a/ SHODOGG and HERBERT MITSCHELE, | ) ) ) ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Date Submitted: September 28, 2018
Date Decided: January 2, 2019

Adam W. Poff, Tammy L. Mercer, and Paul J. Loughman, of YOUNG CONWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Steve Morgans, of MYERS BILLION LLP, Sioux Falls, South Dakota, *Attorneys for the Plaintiffs*.

Herbert W. Mondros, of MARGOLIS EDELSTEIN, Wilmington, Delaware, *Attorneys for the Defendants*.

GLASSCOCK, Vice Chancellor

This matter involves a falling out of former colleagues who were attempting to develop and monetize technology to allow streaming of content from one electronic device to another. Creating such technology, finding practical applications for it, and convincing others to use and pay for it requires intelligence, creativity, and an entrepreneurial spirit. It does not, necessarily, imply great emotional maturity, however. The dispute in this matter, involving disagreements over the meaning of cryptic contracts and amorphous investment opportunities, led the principals to act in ways that application of good will could have easily cured. Instead, this litigation resulted. The Plaintiffs, Charles Siemonsma, and his company, FetchIT, complain that the Defendants, Herbert Mitschele and his company, Shodogg, canceled a license agreement between Shodogg and FetchIT pretextually. The Plaintiffs seek injunctive relief enforcing their rights under the license agreement. The Defendants have counterclaimed, seeking a declaration that their termination of the agreement was contractually permitted. The license agreement itself is poorly drafted and confusing.

Briefly, the parties had agreed to an amendment to the license agreement that, per the Plaintiffs, expanded FetchIT's rights to sublicense intellectual property belonging to Shodogg. The amendment did not remove provisions under which FetchIT had a duty, should it learn of the improper use of Shodogg's IP by third parties, to report that use to Shodogg, and to refrain itself from taking any action

with respect to the improper use. The provision appears to have been intended principally to prevent FetchIT from bringing its own enforcement actions against third parties for use of IP to which FetchIT had acquired rights under the license agreement. However, the language to which the parties agreed was broader, and bound FetchIT to refrain from *any action* with respect to IP infringement of which it was aware, other than reporting that infringement to Shodogg.

In 2017, despite attempts to monetize its product, Shodogg was in financial difficulties. FetchIT, pursuant to the license agreement, was also attempting to develop and monetize Shodogg's IP, primarily in the hospitality market. Due to Shodogg's financial troubles, FetchIT agreed to begin paying part of the salaries of Shodogg engineers who worked in part to perfect hospitality applications, and who had previously been paid solely by Shodogg. Meanwhile, Shodogg needed recapitalization, and Siemonsma wanted to invest. Mitschele agreed to let Siemonsma invest, at least to the extent the recapitalization was undersubscribed by existing investors.

As laid out in painful detail below, Siemonsma learned that a third party, Vizbee, was, according to Shodogg, infringing its IP. Shodogg was attempting to enter an agreement with Turner Broadcasting to use Shodogg's services. Vizbee was competing to provide the same services to Turner. Siemonsma knew, at a minimum, that Shodogg's lawyer had sent a "cease and desist" letter to Vizbee

regarding Shodogg's IP. Meanwhile, Mitschele had become aware that Siemonsma understood an amendment to the license agreement to give FetchIT broad rights to license the Shodogg IP. Mitschele did not believe this had been the parties' intent in entering the amendment to the agreement. He proposed an additional amendment to cure this dispute, which Siemonsma refused to consider. Ultimately, Siemonsma was denied the ability to invest in the Shodogg recapitalization, in a way Siemonsma believed violated Mitschele's promise to him. FetchIT's lawyer, on Siemonsma's behalf, notified Shodogg that Siemonsma demanded a right to invest, to which Shodogg failed to reply.

In the midst of this deteriorating business environment and personal relationship, Siemonsma sent an e-mail to Vizbee, addressed "to whom it may concern." It proposed that Vizbee could resolve its dispute with Shodogg over use of the Shodogg technology, by the simple expedient of licensing the same technology from FetchIT. As it turned out, Vizbee ignored this over-the-electronic-transom communication. It never responded to Siemonsma.

Nonetheless, when word of the e-mail reached Shodogg, it was understandably concerned that its leverage with Vizbee, with which it was still in negotiations, was undercut. Shodogg's lawyer began communication with FetchIT's counsel, insisting that Siemonsma's e-mail had breached the license agreement. Shodogg demanded that FetchIT promise to desist and turn over all communication

3

between Siemonsma/FetchIT and Vizbee. The resulting back-and-forth is laid out below. Each side trumpeted its own concerns—on the Plaintiffs' side, the aborted Shodogg investment opportunity, on the Defendants', the interference in the Shodogg/Vizbee IP dispute. Ultimately, Shodogg terminated the license agreement, and withheld FetchIT's access to Shodogg's technology; this dolorous litigation is the result.

The questions before me are straightforward. Did the Siemonsma/FetchIT e-mail to Vizbee violate the "no action" provision of the license agreement? If so, did Shodogg comply with the determination of materiality, notice, and opportunity to cure provisions, such that it had a contractual right to terminate the agreement absent cure? Finally, did FetchIT fail to cure? What follows is my post-trial decision on these issues. Because I answer all three questions in the affirmative, the Defendants are entitled to relief on their counterclaim, and the relief sought by Plaintiffs must be denied. My reasoning follows.

## I. BACKGROUND

Trial took place over two days, during which three witnesses gave live testimony. The parties submitted 112 exhibits and lodged five depositions, two of which were for witnesses not present at trial. The following facts are undisputed or were proven by a preponderance of the evidence.

### A. Shodogg and FetchIT Enter Into a License Agreement

4

## 1. Background to the Shodogg-FetchIT Relationship

Defendant[1] Touchstream Technologies Inc. d/b/a Shodogg ("Shodogg") is a Delaware corporation founded in 2011.[2] Defendant[3] Herbert Mitschele co-founded Shodogg and serves as its Chief Executive Officer.[4] Shodogg was formed to develop software that enables users to deliver content from one device to another; primarily content from cellphones to television screens.[5] Shodogg focused the application of its software on the consumer market,[6] although it also pursued applications in the enterprise market.[7] Shodogg had filed for patents for its technology and had used the law firm Fish & Richardson to do so.[8]

In January 2012, Mitschele met Plaintiff[9] Charles Siemonsma at the 2012 Consumer Electronics Show ("CES").[10] Siemonsma worked for a company called Quadriga at the time and had a background in the hospitality industry.[11] Quadriga subsequently entered into an agreement with Shodogg in December 2012.[12]

---

[1] And Counterclaim Plaintiff.
[2] Joint Pretrial Order ("JPTO") ¶¶ 3, 4.
[3] And Counterclaim Plaintiff.
[4] JPTO ¶ 5.
[5] JPTO ¶ 4; Trial Tr. 278:5–278:10 (Mitschele).
[6] The consumer market was consumers viewing media, primarily video, in their homes. Trial Tr. 283:17–22, 295:6–7, 295:11–296:15 (Mitschele).
[7] The enterprise market involves viewing media, not just video but also documents and presentations, in a business setting. *Id.* at 294:11–295:10 (Mitschele).
[8] *Id.* at 304:3–6 (Mitschele).
[9] And Counterclaim Defendant.
[10] Trial Tr. 7:17–8:7 (Siemonsma); *id.* at 283:12–284:3 (Mitschele).
[11] *Id.* at 6:22–8:3 (Siemonsma); *id.* at 285:12–13, 288:19–22 (Mitschele).
[12] *Id.* at 7:21–8:16 (Siemonsma); *id.* at 282:11–12, 321:19–21 (Mitschele).

Siemonsma left Quadriga and joined Shodogg in June/July 2013, where he focused on developing Shodogg's opportunities in the hospitality industry.[13] However, Shodogg was unable to close any deals in that market.[14] Without such deals, Shodogg was unable to pay Siemonsma.[15] Furthermore, having tried and failed to expand into the hospitality industry, Shodogg decided to move on and concentrate its efforts on its existing business.[16] As a result, Siemonsma left Shodogg at the end of 2013.[17] Before leaving, Siemonsma informally asked for the ability to continue developing applications for Shodogg's technology in the hospitality industry.[18] Mitschele agreed, because he viewed it as a beneficial opportunity for Shodogg to capitalize on a niche market while Shodogg itself focused on other industries and applications.[19]

In October 2014, Siemonsma founded Plaintiff[20] Fetch Interactive Television LLC ("FetchIT"),[21] a South Dakota company.[22] Siemonsma then approached Mitschele towards the end of 2014 and early 2015 to solidify their existing informal

---

[13] *Id.* at 8:22–9:10 (Siemonsma); *id.* at 285:3–287:19 (Mitschele).
[14] *Id.* at 287:20–288:8 (Mitschele).
[15] *Id.* at 9:11–13 (Siemonsma); *id.* at 287:4–21 (Mitschele).
[16] *Id.* at 287:24–288:8 (Mitschele).
[17] *Id.* at 9:14–9:16 (Siemonsma); *id.* at 288:9–14 (Mitschele).
[18] *Id.* at 289:7–17 (Mitschele).
[19] *Id.* at 289:7–290:15 (Mitschele).
[20] And Counterclaim Defendant.
[21] Trial Tr. 10:2–5 (Siemonsma).
[22] JPTO ¶ 1.

agreement.[23]  As a result, on May 14, 2015, FetchIT and Shodogg entered into a license agreement.[24]

### 2. The License Agreement

According to Section 2.1(a) of FetchIT and Shodogg's May 14, 2015 license agreement (the "License Agreement"):

> Subject to the terms and conditions of this Agreement, Shodogg hereby grants to FetchIT, and FetchIT hereby accepts from Shodogg, an exclusive (as described), non-transferable, sublicenseable (as described), assignable (per Section 15.6) license to use, reproduce and distribute the Software and the Technology in the Territory, solely (i) within the Hospitality Market and (ii) pursuant to the Purpose. Notwithstanding the foregoing, the grant of exclusivity shall exclude Shodogg's direct relationship with Quadriga and its Affiliates and successors . . . .[25]

In Section 2.1(b) of the License Agreement, Shodogg also granted FetchIT a non-exclusive, non-transferable, sublicenseable, assignable license to the Software and the Technology for use in, and application to, the Consumer Market.[26]  The "Territory" was "worldwide, excluding the Asian markets."[27]  The "Consumer Market" was the "direct-to-consumer market for viewing and/or listening to audio,

---

[23] Trial Tr. 10:4–7 (Siemonsma); *id.* at 289:20–290:1 (Mitschele).

[24] JX 1; JPTO ¶ 6; Trial Tr. 10:2–16 (Siemonsma); Trial Tr. 290:12–24 (Mitschele).

[25] JX 1 § 2.1(a).

[26] *Id.* § 2.1(b). "Subject to the terms and conditions of this agreement, Shodogg hereby grants to FetchIT, and FetchIT hereby accepts from Shodogg, a non-exclusive, non-transferable, sublicenseable (as described), assignable (per Section 15.6) license to the Software and the Technology for use in, and application to, the Consumer Market." *Id.*

[27] *Id.* § 1.11.

7

video and imagery content directed at consumer consumption."[28]  The "Hospitality Market," on the other hand, was defined to "encompass[] audio, video and imagery content delivered to consumers at hotels, hotel conference spaces, resorts, lodging, theme parks and cruise lines."[29]

FetchIT's exclusive license, besides being limited to the Hospitality Market, was also "pursuant to the Purpose;"[30] the "Purpose" was defined as:

> [T]he development of applications and extensions to the Software . . . to provides (sic) cloud-based streaming content distribution for either the Hospitality Market and/or the Consumer Market, subject to the terms set forth herein . . . . For clarity, solely within the Consumer Market any products and services developed as part of the Purpose must be b2c and owned, controlled and operated by FetchIT. Therefore, in the Consumer Market, to the extent that FetchIT wishes to offer any products and services provided on a "white label" or b2b basis ("Business Sub-Licensees"), it may only do so with prior written approval from Shodogg in each instance . . . . In the Hospitality Market, FetchIT may contract with Business Sub-Licensees at its discretion provided that it must notify Shodogg in each instance . . . .[31]

In return for the right to license Shodogg's software, FetchIT agreed to pay a license fee of "seven percent ('7.00%') of actually received gross revenues . . . from FetchIT's (or its permitted sublicensee's) sales, sublicense, use, and any other exploitation of the Software and the Technology."[32]  The License Agreement defined "Software" as "the Shodogg application and other Shodogg owned or developed

---

[28] *Id.* § 1.2.
[29] *Id.* § 1.4.
[30] *Id.* § 2.1(a).
[31] *Id.* § 1.7.
[32] *Id.* § 3.1.

8

software for operation of, utilized in connection with, the Technology made available to FetchIT hereunder . . . ."[33] "Technology" was then defined as "any and all proprietary technology, trade secrets, know-how, or other intellectual property of Shodogg, including, without limitation, patents, procedures, platform, . . . whether presently existing or hereinafter developed and acquired.[34]

The License Agreement also included provisions relating to infringement of Shodogg's Technology rights.[35] Under Section 10 of the License Agreement:

> Shodogg shall have the sole right to determine whether or not any action shall be taken against any such infringement, and FetchIT shall not institute any suit or take any action on account of any such infringement without first obtaining the written consent of Shodogg. FetchIT shall provide Shodogg with all possible assistance in any prosecution of such infringement which Shodogg may decide to institute, including without limitation, the execution of necessary documents, filings or instruments, the supplying of necessary information and testifying in connection with any proceedings.[36]

FetchIT also agreed that the License Agreement gives FetchIT no "right, title or interest in Shodogg's Technology, except for the express license for the Territory issued hereunder."[37] Furthermore, "[a]ll rights with respect to the Technology not

---

[33] *Id.* § 1.8. Software was further defined in Schedule A of the License Agreement. *Id.* at Schedule A.
[34] *Id.* § 1.10.
[35] *Id.* § 10.
[36] *Id.* § 10.1.
[37] *Id.*

specifically licensed to FetchIT in this Agreement shall be and hereby are reserved by Shodogg."[38]

According to Section 11.2 of the License Agreement, in the event of a material breach of the License Agreement by one party, the non-breaching party is "entitled to give notice of default and a demand that such breach be corrected within sixty (60) days following the date of such notice;" if the breach is not corrected within that time period, the other party has the "unconditional right to terminate [the License Agreement]."[39] However, the License Agreement provided a different procedure and time period for "a breach of FetchIT's obligations relative to the use of the Technology."[40] In that case, if:

> Shodogg gives notice of any default relating to a breach of FetchIT's obligations relative to the use of the Technology that in the opinion of Shodogg's counsel create (sic) a bona-fide, materially significant threat to Shodogg's rights to the Technology or otherwise to Shodogg's business, [FetchIT] shall cure such default within fifteen (30) days or immediately if deemed to be incurable.[41]

If a breach was not cured, either party could (but was not obligated to) terminate the License Agreement.[42]

---

[38] *Id.*

[39] *Id.* § 11.2.

[40] *Id.*

[41] *Id.* The time period for cure in the License Agreement as written is "fifteen (30) days or immediately." The conflict between the written and numerical forms is not a typographical error of this Court but rather a typographical error in the Agreement. I also note that, in agreeing to immediately cure the incurable, FetchIT and Shodogg show up the more modest claim on the Seabees Memorial: "The difficult we do at once, the impossible takes a bit longer."

[42] JX 1 § 11.3.

10

Shodogg also had the right to terminate the License Agreement if certain Key Performance Indicators ("KPIs")—related to the financing of FetchIT, FetchIT product development, and FetchIT payment of license fees—were not met.[43] As a final note, under the License Agreement if Shodogg entered bankruptcy or wound down, it agreed to provide FetchIT with its source code, in order to allow FetchIT to continue to operate.[44]

To summarize, the License Agreement gave FetchIT an exclusive and sublicenseable license to use Shodogg's Software and Technology in the Hospitality Market. FetchIT was also granted a non-exclusive and sublicenseable license to use Shodogg's Software and Technology in the Consumer Market. However, FetchIT's license in the Consumer Market was further limited; in that market FetchIT could develop b2c (business to consumer) products owned by FetchIT but could not use its license to offer white label or b2b (business to business) products without prior Shodogg written approval. By contrast, FetchIT could offer business sub-licenses in the Hospitality Market at its discretion.

*B. Shodogg Meets Vizbee and Shodogg has IP Woes*

1. Shodogg and Vizbee Compete for Business at Turner

---

[43] *Id.*, at Schedule C.
[44] *Id.* § 11.5.

Toward the end of 2015 Shodogg pursued a business opportunity at Turner Broadcasting Inc. ("Turner"); Shodogg sought to be the platform inside of Turner's application that allowed consumers to move content from Turner's application to their televisions.[45] In early 2016, Shodogg signed a non-binding letter of intent to participate in a program that allowed Turner to perform due diligence on Shodogg.[46] Shodogg then learned the Turner was also considering another company for the same project, Vizbee.[47] Mitschele shared with Siemonsma the facts of Shodogg's prospect in Turner and competition with Vizbee.[48]

Around August 2016, Shodogg learned that Vizbee had been awarded the contract with Turner.[49] Shodogg suspected that Vizbee maybe infringing on Shodogg's patents; Shodogg's patent counsel at the time, Fish & Richardson, concluded, based on publicly available information, that Shodogg had a viable patent infringement case against Vizbee.[50] At this time, Shodogg learned that Fish & Richardson, despite having done a conflicts check, also represented Vizbee in relation to *Vizbee's* patent portfolio.[51]

---

[45] Trial Tr. 296:6–296:17 (Mitschele).
[46] JX 2; Trial Tr. 296:18–297:16 (Mitschele).
[47] Trial Tr. 298:18–299:8 (Mitschele).
[48] *Id.* at 27:21–28:7 (Siemonsma); *id.* at 298:6–299:19 (Mitschele).
[49] *Id.* at 300:11–15 (Mitschele).
[50] *Id.* at 299:23–300:10 (Mitschele).
[51] *Id.* at 303:7–23, 304:7–18 (Mitschele).

Shodogg considered using a patent infringement lawsuit to disrupt Vizbee's relationship with Turner.[52] At the same time, Shodogg learned of a second opportunity at Turner; the data collection component of Turner's application.[53] Shodogg decided to pursue this second opportunity at Turner in lieu of litigation against Vizbee.[54] Vizbee was also vying to provide this second component for Turner.[55]

### 2. Shodogg and Vizbee Meet

Shodogg had personal connections to Turner. According to Mitschele, "several people in Turner were also investors in [Shodogg]."[56] This included Michael Strober, an executive at Turner, who was not only an investor in Shodogg, but also a co-founder, and was related to another Shodogg co-founder who had invented Shodogg's technology.[57] Strober was Shodogg's main contact at Turner; he was in a sense Shodogg's sponsor.[58] Vizbee had its own partisan at Turner, Jesse Redniss.[59] Strober and Redniss arranged for Mitschele and Vizbee's CEO, Darren Feher, to meet on January 4, 2017 at the 2017 CES.[60]

---

[52] *Id.* at 301:10–20 (Mitschele).
[53] *Id.* at 301:21–302:9 (Mitschele).
[54] *Id.* at 302:16–303:6 (Mitschele).
[55] JX 104, at 27:3–6 (Feher).
[56] Trial Tr. 396:5–7 (Mitschele).
[57] JX 112; Trial Tr. 277:20–278:10, 395:14–396:9 (Mitschele).
[58] Trial Tr. 396:7, 399:21–24 (Mistchele).
[59] *Id.* at 399:21–24 (Mitschele).
[60] JX 5.

The purported purpose of the meeting between Mitschele and Feher was to introduce Vizbee and Shodogg to each other, and to see if they could work together to the benefit of Turner.[61] During the meeting, Mitschele and Feher did not discuss Shodogg's belief that Vizbee was infringing on Shodogg's patents.[62] However, Mitschele believed that this IP infringement was the "elephant in the room" at the meeting.[63] By contrast, Feher testified that he attended the meeting as a courtesy to his client, Turner, and prior to the meeting he was aware through Turner only that a company called Shodogg existed and claimed to be able to perform a similar function as Vizbee.[64] As a result, Feher had no real idea what Shodogg did prior to meeting Mitschele, but left the meeting with the understanding that Shodogg sought to compete with Vizbee over the data collection component of the Turner application.[65] However, Feher did not view Shodogg as a real competitor and did not believe Shodogg had a "viable product."[66]

### 3. Shodogg Sends a "Cease and Desist" Letter to Vizbee

---

[61] JX 104, at 21:3–15, 27:16–28:11, 37:8–13 (Feher); Trial Tr. 305:6–14 (Mitschele).
[62] JX 106, at 40:11–14 (Feher); Trial Tr. 306:13–16, 309:24–310:8 (Mitschele).
[63] Trial Tr. 306:13–16, 309:24–310:8 (Mitschele).
[64] JX 104, at 19:13–21:17 (Feher); JX 105, at 170:22–172:7 (Feher).
[65] JX 104, at 26:11–28:22 (Feher).
[66] JX 104, at 28:11–29:5 (Feher); JX 105, at 171:25–174:12 (Feher).

14

After the January meeting, Shodogg reached out to Vizbee to continue discussions on a potential collaboration but received no response.[67] By April 2017, it became clear to Shodogg that it would not be able to win any business within the Turner application.[68] Surprisingly, in light of its conflict of interest, Fish & Richardson agreed to represent Shodogg in an infringement action against Vizbee.[69]

Mitschele had shared with Siemonsma and FetchIT that Shodogg believed Vizbee was infringing on Shodogg's patents, that Shodogg was considering taking action, and that Fish & Richardson had a conflict problem.[70] In early April, Siemonsma, based on discussions with his own counsel, told Mitschele that Shodogg should sue Fish & Richardson and also find new patent counsel.[71] Around this time, Siemonsma also met a patent attorney from the law firm Orrick, Herrington & Stutcliffe ("Orrick"), and set up a conference call between the attorney, Siemonsma and Mitschele to discuss the potential of Orrick representing Shodogg in separate patent litigation, against Google.[72] During this call, Mitschele mentioned to Orrick that Shodogg also believed Vizbee was infringing Shodogg's patents, however,

---

[67] JX 13; Trial Tr. 307:15–309:12 (Mitschele). Feher does not believe he received any such communications from Shodogg, but he also did not attempt to reach out to Shodogg. JX 105, at 182:3–16 (Feher).

[68] JX 16; Trial Tr. 310:10–19, 313:23–314:12 (Mitschele).

[69] Trial Tr. 311:10–16 (Mitschele).

[70] *Id.* at 74:21–75:19 (Siemonsma); *id.* at 303:7–304:2, 312:4–8 (Mitschele).

[71] JX 15; Trial Tr. 77:18–80:16 (Siemonsma); Trial Tr. 312:4–313:13 (Mitschele).

[72] Trial Tr. 29:4–32:2 (Siemonsma).

Orrick was not interested in representing Shodogg in regard to Vizbee.[73] Shodogg decided to continue with Fish & Richardson as patent counsel.[74]

On April 21, 2017, Fish & Richardson sent Vizbee a "cease and desist" letter on behalf of Shodogg.[75] In the letter, Fish & Richardson alleged that Vizbee was infringing on multiple patents owned by Shodogg, which it listed, and requested that Vizbee cease such infringement.[76] Siemonsma knew, through discussions with Mitschele, that Fish & Richardson had sent a letter to Vizbee and that Shodogg was alleging that Vizbee was infringing on Shodogg's IP.[77] Siemonsma did not see the letter and was not aware of the basis for the infringement allegations.[78]

### 4. Vizbee Responds and Shodogg Finds New IP Counsel

On April 24, 2017, Vizbee's counsel, Goodwin Proctor ("Goodwin"), responded to Fish & Richardson's April 21 letter.[79] Goodwin wrote that "Vizbee was greatly disturbed to receive a letter from its own patent counsel accusing Vizbee of infringing [Shodogg] patents."[80] Goodwin demanded that Fish & Richardson immediately cease representation adverse to Vizbee.[81] Goodwin did not address the

---

[73] *Id.* at 32:3–16 (Siemonsma).
[74] *Id.* at 313:6–10 (Mitschele).
[75] JX 21; Trial Tr. 311:21–312:3 (Mitschele).
[76] JX 21.
[77] Trial Tr. 33:16–34:1 (Siemonsma)
[78] *Id.* at 34:2–7 (Siemonasma)
[79] JX 23.
[80] *Id.* (emphasis in original)
[81] *Id.*

allegations of IP infringement.[82]  After Vizbee's response letter, Shodogg found new patent counsel, Paul Keller of Norton Rose Fulbright.[83]

### C. Shodogg and FetchIT Add an Addendum to Their License Agreement

#### 1. Shodogg Runs Into Financial Problems, and FetchIT and Shodogg Talk

After signing the License Agreement, FetchIT set out to develop a proof of concept product which used the Shodogg platform.[84]  To complete their proof of concept they required additional features and components to be developed for the platform.[85]  Prior to 2017, Shodogg employed several programmers and project managers, and some of these employees worked to develop the features and components that FetchIT needed, and did so free of charge to FetchIT.[86]  However by April 2017, Shodogg was experiencing financial difficulties and could no longer pay all of its employees; as a result, Shodogg let go several employees, including ones that had been working on platform features and components for FetchIT.[87]  On April 3, 2017 Mitschele e-mailed Siemonsma to tell him that two employees who had been working with FetchIT were no longer with the company.[88] Mitschele wrote

---

[82] *Id.*
[83] Trial Tr. 396:22–397:16 (Mitschele).
[84] *Id.* at 13:23–16:11 (Siemonsma).
[85] *Id.* at 16:12–18:3 (Siemonsma).
[86] JX 25; Trial Tr. 18:2–19:14 (Siemonsma); Trial Tr. 315:3–6, 379:22–382:8 (Mitschele).
[87] JX 14; JX 25; Trial Tr. 300:16–301:2, 314:23–16, 381:13–19 (Mitschele).
[88] JX 25.

in his e-mail: "No resources left. Sorry man."[89]  Around this time, given Shodogg's parlous financial straits, Shodogg's Board of Directors suggested a recapitalization of Shodogg.[90]

After Mitschele's April 3, 2017 e-mail, Siemonsma and Mitschele had multiple discussions about Shodogg's recapitalization and FetchIT's relationship with Shodogg.  Siemonsma wanted Shodogg's engineers to continue working on features and components for FetchIT, and Siemonsma was willing to pay for their time.  He agreed to make five monthly payments of ten thousand dollars to Shodogg.[91]  Siemonsma also wanted to participate in Shodogg's recapitalization.[92] Mitschele agreed to allow Siemonsma to participate if the recapitalization was undersubscribed after first being opened to existing investors.[93]  As a result of these discussions, FetchIT and Shodogg entered into an Addendum to the License Agreement (the "Addendum") on April 20, 2017.[94]  Siemonsma's potential participation in the recapitalization was not reflected in the Addendum and was understood to be a separate but related agreement.[95]

2. The Addendum

---

[89] *Id.*

[90] Trial Tr. 314:17–18 (Mitschele). *See also* JX 27 (Mitshcele writing on May 17 that "[y]esterday, we literally had about $1,000 in hand").

[91] Trial Tr. 23:1–25:19 (Siemonsma); *id.* at 325:18–326:7 (Mitschele).

[92] *Id.* at 23:15–18, 24:2–7, 34:6–10 (Siemonsma); *id.* at 316:14–319:19 (Mitschele).

[93] *Id.* at 39:1–13, 89:6–14 (Siemonsma); *id.* at 317:16–319:19 (Mitschele).

[94] JX 20; Trial Tr. 25:23–26:17 (Siemonsma); Trial Tr. 320:16–322:4 (Mitschele).

[95] JX 17; JX 18; Trial Tr. 38:7–10 (Siemonsma); Trial Tr. 322:5–17 (Mitschele).

The original License Agreement provided that:

> Subject to the terms and conditions of this Agreement, Shodogg hereby grants to FetchIT, and FetchIT hereby accepts from Shodogg, an exclusive (as described), non-transferable, sublicenseable (as described), assignable (per Section 15.6) license to use, reproduce and distribute the Software and the Technology in the Territory, solely (i) within the Hospitality Market and (ii) pursuant to the Purpose. Notwithstanding the foregoing, the grant of exclusivity shall exclude Shodogg's direct relationship with Quadriga and its Affiliates and successors . . . .[96]

According to the Addendum, "the exclusivity granted to FetchIT pursuant [to the section quoted above] is hereby extended to include the Travel market in addition to the Hospitality Market."[97] Furthermore, according to the Addendum the following was to be deleted from the section of the License Agreement quoted above: "and (ii) pursuant to the Purpose. Notwithstanding the foregoing, the grant of exclusivity shall exclude Shodogg's direct relationship with Quadriga and its Affiliates and successors."[98] The deletion of the "pursuant to the Purpose" limitation removed barriers to FetchIT's exclusive pursuit of the Travel market; the parties dispute their further intent as to its removal.

The Addendum noted that "FetchIT agrees to pay Shodogg for access to two backend developers for five months, commencing on May 1, 2017 for a total cost of

---

[96] JX 1 § 2.1(a).
[97] JX 20.
[98] *Id.*

19

$10,000 per month."[99]   FetchIT had never met any of the Key Performance Indicators or KPIs in the original License Agreement.[100]  The Addendum provided new KPIs which superseded the KPIs in the License Agreement.[101]

### 3. FetchIT Rejects a Second Addendum and Shodogg's Recapitalization is Oversubscribed

In mid-May 2017, Siemonsma and Mitschele exchanged phone calls on a meeting FetchIT had with a company called Guest-Tek.  Siemonsma reported to Mitschele that FetchIT had an opportunity to sublicense Shodogg's IP to Guest-Tek.[102]  Mitschele told Siemonsma that FetchIT did not have the right to sublicense Shodogg's IP.[103]   Siemonsma replied that the Addendum gave FetchIT such a sublicensing right.[104]  Siemonsma reasoned that the removal of the "pursuant to the Purpose" language extended FetchIT's right to sublicense Shodogg's IP.[105]

Mitschele, after speaking to Shodogg's Board of Directors, called Siemonsma and told him that he never intended to give FetchIT the right to sublicense Shodogg's IP, and if the Addendum contained such language it needed to be amended.[106] Siemonsma insisted that the Addendum gave him such a right.[107]  On May 17, 2017,

---

[99] *Id.*
[100] Trial Tr. 315:12–13, 320:19–21 (Mitschele).
[101] JX 20.
[102] Trial Tr. 34:13–23 (Siemonsma); *id.* at 331:15–332:4 (Mitschele).
[103] *Id.* at 35:11–16 (Siemonsma); *id.* at 332:1–332:12 (Mitschele).
[104] *Id.* at 35:19–36:1 (Siemonsma); *id.* at 332:12–332:14 (Mitschele).
[105] *Id.* at 58:16–60:14 (Siemonsma).
[106] *Id.* at 35:11–36:12 (Siemonsma); *id.* at 332:24–334:3 (Mitschele).
[107] *Id.* at 36:9–12 (Siemonsma).

Mitschele e-mailed Siemonsma and told him that "I need lawyers to finalize this language but we need something to the effect of: in regards to the purpose: notwithstanding the foregoing, fetchit agrees that it has no rights to independently sublicense Shodogg patents . . . ."[108] Mitschele then wrote:

> Where we can give:
> - include you as much as I can in the Shodogg round, as expected. I can probably work to get 20%, but it will be tight
> - Include any "hospitality only" companies as a carve out to the sublicense rights – where we would work together to force them to use the Fetchit product[109]

On May 18, Mitschele e-mailed a draft of a second addendum, written by Shodogg outside counsel, to Siemonsma.[110] Siemonsma never responded to Mitschele's e-mail and refused to sign the second addendum.[111]

During the same time period, Mitschele was organizing the Shodogg recapitalization. Shodogg sought to raise $420,000 in its recapitalization.[112] On May 18, 2017, Mitschele provided an update on the recapitalization efforts to John Burns, Chairman of Shodogg's Board of Directors, and Rob Sivitilli, a Shodogg investor and Board observer.[113] Mitschele indicated that Shodogg had met its fundraising goal and that five existing investors were oversubscribed: in other words

---

[108] JX 28
[109] *Id.*
[110] JX 30; JX 31.
[111] Trial Tr. 37:7–38:10 (Siemonsma); *id.* at 334:12–335:6, 399:2–13 (Mitschele).
[112] *Id.* at 317:13–15 (Mitschele).
[113] JX 32.

these existing investors were contributing more than their pro rata share.[114] Mitschele also wrote: "[W]e need to fix this issue with Fetchit. The way the contract is written will cause us to have major issues in licensing our IP free and clearly."[115]

Mitschele had separately e-mailed Siemonsma, on May 17, 2017, with details on the recapitalization.[116] Although he was aware (by May 18, at least) that the recapitalization was oversubscribed, Mitschele, nonetheless advised Siemonsma that he did not know how much would be available after existing investors participated; therefore Siemonsma should wire a certain amount of funds to cover any available equity purchase, and Mitschele would return any unused amount.[117] In response, FetchIT wired $200,000 to Shodogg, which was in excess of Mitschele's suggest amount.[118] On May 22, Mitschele e-mailed Siemonsma to inform him that "FetchIT will not be allocated a participation in Shodogg's current fundraising," and that Shodogg would return all the money that FetchIT had sent.[119] Siemonsma replied on May 25 and claimed that by returning FetchIT's money "[Mitschele had] violated [the] License Agreement and . . . Mitschele's personal agreement with

---

[114] *Id.*
[115] *Id.*
[116] JX 26.
[117] JX 26.
[118] Trial Tr. 40:4–41:3 (Siemonsma).
[119] JX 35.

22

[Siemonsma]."[120]  Siemonsma was frustrated that he had not been allowed to participate in the recapitalization, which he believed was his contractual right.[121]

FetchIT's legal counsel, Woods Fuller, sent Shodogg a letter on July 7, 2017 seeking to resolve "ownership issues."[122]  According to the letter, if Shodogg refused to recognize Siemonsma and FetchIT's right to purchase Shodogg shares, then "[FetchIT and Siemonsma] will be forced to pursue other avenues to protect their interests . . . including litigation and/or exercising FetchIT's sublicensing and related rights under the License Agreement and Addendum."[123]  On July 11, 2017, Mitschele forwarded this letter to Shodogg's counsel, which, as mentioned, was now Keller of Norton Rose Fulbright, to formulate a response.[124]  During this time FetchIT continued to make the monthly payments envisioned in the Addendum,[125] and Mitschele and Siemonsma communicated throughout June and part of July as to FetchIT's ongoing demonstrations to potential clients and the work that Shodogg was conducting on its platform for FetchIT.[126]

*D. Shodogg, Vizbee and FetchIT*

---

[120] *Id.*  According to his e-mail, Siemonsma believed that he had the right to purchase Shodogg stock after existing shareholders had subscribed to Shodogg's recapitalization and before existing shareholders oversubscribed. *Id.*
[121] Trial Tr. 48:17–49:8 (Siemonsma).
[122] JX 42.
[123] *Id.*
[124] JX 45; Trial Tr. 335:14–337:4 (Mitschele).
[125] Trial Tr. 24:8–11 (Siemonsma); *id.* at 326:2–7 (Mitschele).
[126] JX 39; JX 41; JX 49.

23

### 1. Shodogg and Vizbee Resume Talks

In May 2017, Turner executives asked Feher, Vizbee's CEO, to meet with Rob Sivitilli, an investor and board observer in Shodogg.[127] Turner was aware of Shodogg's patent infringement allegations against Vizbee[128] and suggested a meeting in the hopes that Shodogg and Vizbee could resolve their dispute without resorting to litigation.[129] Feher and Sivitilli exchanged phone calls and e-mails during the end of May and early June, which culminated in an in-person meeting on June 9, 2017.[130] Sivitilli was a former investment banker and Shodogg hoped Sivitilli could use his background and experience to broker a collaboration with Vizbee.[131]

Sivitilli and Feher discussed a potential collaboration at their June 9, 2017 meeting; Sivitilli proposed everything from a partnership to a merger, and even suggested a fifty-fifty share-for-share exchange.[132] Vizbee had received Shodogg's April 21, 2017 "cease and desist" letter by this time. Although Vizbee's response had only been to tell Fish & Richardson itself to cease and desist, Feher understood

---

[127] JX 37, at 3; JX 104, at 50:21–52:4 (Feher); JX 106, at 16:11–22 (Sivitilli); Trial Tr. 337:13–337:22 (Mitschele).
[128] As previously mentioned, one of Turner's executives was a co-founder and investor in Shodogg.
[129] JX 104, at 50:21–52:5 (Feher); JX 106, at 16:23–17:2 (Sivitilli).
[130] JX 37.
[131] JX 106, at 20:9–22:1 (Sivitilli); Trial Tr. 337:13–339:4 (Mitschele).
[132] JX 105, at 194:9–20 (Feher); JX 106, at 22:2–23:2 (Sivitilli).

that Shodogg was considering IP infringement litigation against Vizbee.[133]  Feher was open to an alternative to litigation;[134] while Feher believed Shodogg's infringement claims were baseless, litigation was costly, distracting, and disruptive at a time when Vizbee was actively raising capital from Turner.[135]  However, at the time of the June 9, 2017 meeting, Feher had little to no understanding of what value Shodogg could bring to a collaboration with Vizbee.[136]  As a result, Sivitilli and Feher agreed that Feher should meet with Mitschele again before further discussions on the structure of any prospective collaboration between Vizbee and Shodogg.[137]

On June 30, 2017, Feher and Mitschele met in person at Vizbee's offices; Sivitilli joined by phone.[138]  Feher and Mitschele discussed their respective businesses, but focused mostly on Shodogg.[139]  From their discussions, it was clear that a Shodogg patent lawsuit against Vizbee was the alternative to any collaboration, although prospective litigation was not discussed in any detail.[140]  At the end of the meeting, the two sides agreed to continue talks and to enter into a

---

[133] JX 104, at 54:2–5, 58:2–9, 61:23–62:3 (Feher).

[134] JX 104, at 68:4–7, 70:24–72:1 (Feher); JX 105, at 196:10–14 (Feher); JX 106, at 21:14–22 (Sivitilli).

[135] JX 104, at 66:8–67:7, 124:12–125:7 (Feher); JX 105, at 184:22–185:6, 189:5–14 195:11–15, 195:20–23, 213:8–214:2 (Feher)

[136] JX 104, at 74:6–11 (Feher); JX 105, at 195:7–10 (Feher); JX 106, at 23:3–10 (Sivitilli).

[137] JX 105, at 196:15–21 (Feher); JX 106, at 23:13–19 (Sivitilli).

[138] JX 40; Trial Tr. 341:15–342:4 (Mitschele); JX 104, at 80:24–81:11 (Feher); JX 106, at 29:8–14 (Sivitilli).

[139] JX 104, at 81:12–82:16 (Feher); JX 106, at 29:15–25 (Sivitilli); Trial Tr. 342:5–343:15 (Mitschele).

[140] JX 104, at 81:18–82:5 (Feher); JX 106, at 27:17–29:7 (Sivitilli); Trial Tr. 343:16–344:7 (Mitschele).

mutual non-disclosure agreement ("MNDA") so that confidential information could be shared.[141]

Vizbee and Shodogg left the meeting on June 30, 2017 with very different understandings of the potential for collaboration. Feher did not rule out working with Shodogg at the June 30 meeting, but based on what Shodogg had shared, Feher did not believe there was any value or benefit in Vizbee collaborating with Shodogg.[142] At the meeting, Feher discovered that Shodogg had "no contracts, no revenue, no customer agreements, no live deployments, [and] no people."[143] According to Feher, the only area where collaboration value could then exist was Shodogg's IP, which Shodogg would need to disclose to Vizbee, thus necessitating a MNDA and further meetings.[144] By contrast, Sivitilli and Mitschele believed that Vizbee was interested in a potential collaboration.[145]

### 2. FetchIT Sends an E-mail to Vizbee

For context, on July 7, 2017 FetchIT legal counsel had sent Shodogg the letter claiming that FetchIT was entitled to an interest in Shodogg and had been denied this interest when it was not allowed to participate in the recapitalization.[146] FetchIT received no immediate response. On July 10, 2017, Siemonsma sent an e-mail to

---

[141] JX 105, at 56:20–57:3 (Feher); JX 106, at 33:12–24 (Sivitilli); Trial Tr. 343:3–5 (Mitschele).
[142] JX 104, at 55:21–57:20 (Feher).
[143] JX 104, at 77:8–10 (Feher). *See also* Trial Tr. 343:6–15 (Mitschele).
[144] JX 104, at 56:11–24, 77:11–25 (Feher).
[145] Trial Tr. 339:5–339:12, 342:17–343:5 (Mitschele); JX 106, at 30:17–31:5 (Sivitilli).
[146] JX 42.

the general Vizbee e-mail address.[147] Siemonsma addressed the e-mail to "To whom

it may concern," and wrote:

> My name is Chuck Siemonsma and I am the CEO of [FetchIT]. I was
> hoping to set up a call with your CEO to discuss a partnership that
> would resolve any issues you currently have with Shodogg. I was
> previously with Shodogg but left two years ago to establish FetchIT. I
> have an existing license to the Shodogg platform and technology,
> exclusively in Hospitality and Travel, and have the ability to sublicense
> their platform and IP.
>
> I can discuss more during a call, but felt it important to let you know,
> confidentially, that I may be able to help resolve any potential issues
> you may have with them.[148]

Siemonsma knew before sending the e-mail that Shodogg considered Vizbee to be

infringing on their IP and had sent Vizbee a "cease and desist" letter.[149] Siemonsma

also believed that the Addendum gave FetchIT the right to sublicense Shodogg's

platform *and* technology.[150] However, he knew Mitschele strenuously disagreed

with this understanding of the parties' contract. Feher received and read

Siemonsma's e-mail; however, Feher never replied.[151] Feher had never heard of

Siemonsma or FetchIT before this e-mail.[152] Feher placed no credence in

Siemonsma's e-mail; furthermore, Feher testified the e-mail did not change his

---

[147] JX 43
[148] *Id.*
[149] Trial Tr. 94:14–20 (Siemonsma).
[150] *Id.* at 98:5–99:7 (Siemonsma).
[151] JX 104, at 85:12–87:6 (Feher).
[152] JX 104, at 89:15–24 (Feher); JX 106, at 34:15–35:1 (Sivitilli).

position on the opportunity of collaborating with Shodogg, or rather the lack thereof.[153]

### 3. Vizbee Discloses Contact with FetchIT

On July 12 or 13, 2017, Feher and Sivitilli had a telephonic meeting to follow up on the June 30 meeting, primarily involving the MNDA.[154] At the end of the call, Feher informed Sivitilli that he had received an e-mail from an individual named Siemonsma who worked for a company called FetchIT, and that Siemonsma claimed to have a licensing agreement with Shodogg. Sivitilli told Feher in response that Sivitilli knew that FetchIT had some relationship with Shodogg but did not know why FetchIT would reach out to Vizbee.[155]

After his phone call with Feher, Sivitilli immediately called Mitschele and told Mitschele that FetchIT had e-mailed Vizbee with some sort of offer.[156] Mitschele and Sivitilli worried that the FetchIT e-mail could impact their discussions with Vizbee; and they believed that Feher had raised the FetchIT e-mail intentionally to gain leverage in Vizbee's discussions with Shodogg.[157] Sivitilli counseled Mitschele not to discuss FetchIT with Vizbee in future discussions, and instead to

---

[153] JX 104, at 87:14–88:7 (Feher); JX 105, at 211:15–212:4, 233:22–234:13 (Feher).

[154] JX 104, at 89:3–15 (Feher); JX 106, at 32:3–33:25 (Sivitilli). There is conflicting evidence on whether the call occurred on July 12 or 13. However, the substance of the call is not contested and the date is immaterial.

[155] JX 106, at 35:2–10 (Sivitilli).

[156] JX 106, at 40:9–13 (Sivitilli); Trial Tr. 345:23–346:11 (Mitschele).

[157] JX 106, at 38:16–41–18 (Sivitillit); Trial Tr. 345:23–347:9 (Mitschele).

use Shodogg's legal counsel to contact FetchIT to discover the extent of FetchIT and Vizbee's communications.[158] Mitschele had contacted Keller of Norton Rose Fulbright days earlier to respond to FetchIT's July 7, 2017 letter concerning FetchIT's purported investment right in Shodogg. Mitschele contacted Keller again after talking to Sivitilli. Mitschele expressed to Keller a desire to immediately terminate FetchIT's License Agreement, but Keller counseled him to first discover the extent of FetchIT's contact with Vizbee before deciding whether to terminate.[159]

### 4. Shodogg and FetchIT Exchange Letters and E-mails

On July 14, 2017, Keller sent a letter to FetchIT's legal counsel, Woods Fuller. Keller's letter acknowledged Shodogg's receipt of FetchIT's July 7, 2017 letter and stated that "We will respond to that letter in due course, but a more immediate concern has arisen."[160] Keller wrote that "Shodogg has become aware that . . . [FetchIT], through . . . Siemonsma, has communicated via email directly with Vizbee . . . , a company that FetchIT knows is improperly using Shodogg's technology."[161] Keller wrote that according to the License Agreement:

> FetchIT is prohibited from taking "any action" with regards to companies that FetchIT is aware may infringe Shodogg's Technology rights. Under the Agreement, FetchIT also is obligated to "provide Shodogg with all possible assistance" on matters relating to any such unauthorized use. Regardless, "[i]n no event will FetchIT have any

---

[158] Trial Tr. 346:1–347:11 (Mitschele); JX 106, at 41:19–43:1 (Sivitilli).
[159] Trial Tr. 348:22–349:11, 405:9–16 (Mitschele).
[160] JX 47.
[161] *Id.*

right to use for itself or for any third party any such Technology without the prior written consent of Shodogg."[162]

Keller then maintained that "FetchIT's 'action' of communicating to Vizbee is . . . a direct violation of [FetchIT's] obligation to 'take no action' . . . [and that] FetchIT . . . is obligated to provide 'all reasonable assistance' on matter relating to any such unauthorized use."[163]

Keller then wrote that FetchIT's "material breach and communications with Vizbee in this instance create a bona-fide materially significant threat to Shodogg's rights . . . . [and] this letter . . . constitutes notice, pursuant to Section 11.2 of the Agreement, of FetchIT's default . . . ."[164] Section 11.2 of the License Agreement describes the right and process by which a non-breaching party can terminate, after opportunity for cure, the License Agreement for a material breach, including a breach of FetchIT's obligations relative to the use of Shodogg's technology.[165] Keller then wrote that FetchIT needed to correct its default by:

> [C]onfirming immediately that no further communications beyond the above mentioned email have taken place with Vizbee, and that no further communications with Vizbee will take place. . . . Please also provide the above mentioned email from FetchIT to Vizbee immediately.[166]

---

[162] *Id.*
[163] *Id.*
[164] *Id.*
[165] JX 1 § 11.2.
[166] JX 47.

30

Based on the record before me, I find that Keller did in good faith find Siemonsma's communication to Vizbee, and its implication of cooperation with Vizbee in its dispute with Shodogg (as described to Shodogg by Feher) to constitute a "bona-fide materially significant threat" to Shodogg's Technology rights and business.

On July 19, 2017, FetchIT's legal counsel sent Keller a letter response. In this response, FetchIT took the position that the License Agreement and Addendum gave FetchIT "the right to sublicense Shodogg's Software and Technology in the Hospitality Market worldwide (except for Asia) and in the Consumer Market worldwide."[167] According to FetchIT, this included the "right to contact potential customers and offer sublicenses," a right "FetchIT intends to exercise," and which FetchIT did exercise when it "contact[ed] Vizbee . . . to potentially discuss a sublicense agreement."[168]

FetchIT further took the position that it had not violated its obligations related to Shodogg's IP under the License Agreement because "FetchIT has not taken any action against Vizbee for any alleged infringement of Shodogg's intellectual property, nor does FetchIT intend to commence suit against Vizbee."[169] Furthermore, "FetchIT has no intention to resolve claims against Vizbee for past infringement . . . [but] FetchIT does have the right to grant Vizbee and other vendor's

---

[167] JX 50.
[168] *Id.*
[169] *Id.*

a sublicense for the future use of Shodogg's Software and Technology."[170] As a result, FetchIT argued in the letter that it "did not breach the [License Agreement and Addendum] by contacting Vizbee with the intent to discuss a future sublicensing arrangement." As to disclosing to Shodogg the e-mail FetchIT sent to Vizbee, FetchIT wrote that it "had no contractual or other obligation to share with Shodogg its communications with Vizbee or any other potential sublicensors."[171]

Keller responded to FetchIT's July 19, 2017 letter later that day with another letter. Keller wrote that "any action by FetchIT . . . to sublicense Shodogg's Technology to Vizbee, an infringer, is in direct violation of FetchIT's plain obligation not to (sic) any 'action on account of such infringement.'"[172] Further, Keller wrote, "[FetchIT's letter] leaves unclear whether FetchIT's discussions with Vizbee are continuing. Please confirm by 5:30 PM Eastern Time today that FetchIT has ceased its discussions with Vizbee."[173]

FetchIT's legal counsel, Woods Fuller, responded to Keller's July 19 letter by e-mail, again on the same day. Woods Fuller wrote that:

> If FetchIT enters into a sublicense agreement with Vizbee or any other vendor allegedly infringing Shodogg's patent rights, such sublicense would not be "on account of" any such infringement, but would be pursuant to FetchIT's right to sublicense Shodogg's Software and

---

[170] *Id.*
[171] *Id.*
[172] JX 52.
[173] *Id.*

32

Technology. Nothing in the License Agreement restricts FetchIT's sublicensing rights to parties not accused of infringement.[174]

Woods Fuller then noted that they had briefly spoken to Siemonsma and that Siemonsma "is unwilling to disclose FetchIT's discussions or intentions regarding Vizbee at this time. [Siemonsma] is troubled that Shodogg is demanding information . . . when Shodogg still has not responded to [Woods Fuller's] letter of July 7, 2017. The issues raised in [that] letter are just as important and time sensitive to [Siemonsma] and FetchIT as the Vizbee matter apparently is to Shodogg."[175]

Keller sent Woods Fuller several more communications in July. Keller responded to Woods Fuller's July 19, 2017 e-mail, with another e-mail on the same day. Keller wrote that "[t]his is not a quid pro quo situation," and "any current effort to subvert Shodogg's rights under the agreement and license that infringer [Vizbee] is an immediate issue that requires immediate action."[176] Keller followed up his July 19 e-mail, with another e-mail on July 20. In this e-mail, Keller "memorialize[d] certain aspects of the factual record and [Shodogg's] multiple attempts to prevent [FetchIT] from continuing to take any action to sublicense Vizbee . . . ."[177] And then on July 21, 2017, Keller sent a letter to Woods Fuller in response to their July 7,

---

[174] JX 55.

[175] *Id.*

[176] JX 56.

[177] JX 57. In the e-mail Keller identified thirteen points over which he claimed there was no dispute, including certain terms of the License Agreement and that FetchIT knew Shodogg considered Vizbee to be an infringer and that Shodogg had hired counsel to pursue its rights against Vizbee. *Id.*

2017 letter, which had purported that FetchIT had ownership rights in Shodogg. In his July 21 letter, Keller disputed that FetchIT had any such rights, whether in an agreement or otherwise, and that Siemonsma "was offered only the possibility that he could participate if the [recapitalization] was undersubscribed.[178] Woods Fuller, however, did not send any response or communication to Keller until August 9, 2017.[179]

### 5. Vizbee agrees to an MNDA with Shodogg

Mitschele believed that the FetchIT's "To whom it may concern" e-mail to Vizbee had changed the dynamic of the discussions between Shodogg and Vizbee; Mitschele perceived that the "speed and tenor of the interactions [with Vizbee] slowed down."[180] Feher and Sivitilli exchanged e-mails after their July 13, 2017 call in order to finalize the MNDA and to set a date for the next meeting between Vizbee and Shodogg.[181] Sivitilli, after offering a new draft of the MNDA to Feher and not receiving a response for several days, wrote in an e-mail on July 28, 2017 "I sense there is an impasse here that cannot be overcome. Do you concur?"[182] Feher replied on July 29, 2017 and wrote "Honestly, I have not looked at it, forwarded it to my lawyer and have been traveling this week… please don't misread. I promise ill (sic)

---

[178] JX 59.
[179] JX 66.
[180] Trial Tr. 405:20–406:6 (Mitschele).
[181] JX 63; JX 64.
[182] JX 64.

34

get back to you asap."[183] Vizbee and Shodogg did execute an MNDA and arranged a meeting for August 8, 2017.[184]

### 6. Shodogg Confronts Vizbee with Patent Allegations on August 8, 2017

On August 8, 2017, Vizbee and Shodogg met at Norton Rose's offices in New York.[185] Feher and Vizbee's CTO attended in person on behalf of Vizbee and Vizbee's counsel was present via videoconference.[186] Keller and Mitschele attended in person for Shodogg, and Sivitilli listened by phone.[187] Mitschele testified that Shodogg viewed the purpose of the meeting to be to "lay out [Shodogg's] IP infringement case."[188] To this end, the meeting primarily consisted of Shodogg giving a presentation on Shodogg's infringement claims.[189] This took Feher by surprise, Feher had expected a presentation on the detail and value of Shodogg's IP.[190] Instead, Feher was presented with Shodogg's infringement claims against Vizbee; from Feher's perspective this ended "any potential further discussions about any collaboration."[191]

### 7. Shodogg Terminates the License Agreement with FetchIT

---

[183] *Id.*
[184] *Id.*
[185] *Id.*
[186] Trial Tr. 365:19–24 (Mitschele).
[187] *Id.* at 365:19–24 (Mitschele).
[188] *Id.* at 366:1–5, 367:6–368:7 (Mitschele).
[189] JX 104, at 95:5–24 (Feher); Trial Tr. 366:8–367:5 (Mitshcele).
[190] JX 104, at 95:8–24, 115:14–25 (Feher).
[191] JX 104, at 95:25–96:7, 117:12–20 (Feher); JX 105, at 218:16–220:11 (Feher).

On August 9, 2017, FetchIT's counsel responded to Keller's e-mails and letters of July 19, 20 and 21. First, FetchIT disagreed with Keller's memorialization of the factual dispute, specifically Keller's assertion that FetchIT was aware that Shodogg had retained legal counsel to pursue an infringement claim against Vizbee.[192] In actual fact, as the record now discloses, Siemonsma was aware, at least, that Shodogg's counsel had demanded Vizbee cease infringement. Second, FetchIT argued that even under Shodogg's interpretation of the License Agreement and Addendum, FetchIT would only be precluded from sublicensing to an actual infringer of Shodogg's patent rights.[193] FetchIT then demanded that Shodogg demonstrate or provide some proof that "Vizbee had engaged in infringement of Shodogg's patent rights." Finally, FetchIT found Shodogg's response on FetchIT's ownership claims to be "incomplete and unpersuasive," and FetchIT would therefore "continue to pursue their rightful and promised ownership interests in Shodogg . . . ."[194]

On August 11, 2017, Keller sent FetchIT a letter terminating the License Agreement.[195] Keller wrote that Shodogg had given FetchIT notice of FetchIT's

---

[192] JX 66.
[193] *Id.*
[194] *Id.*
[195] JX 70.

material breach in a July 14, 2017 letter and Shodogg had allowed FetchIT time to cure that breach.[196] According to the letter:

> Instead of using the cure period to "cure" its breach, FetchIT confirmed and re-confirmed its intention to continue to breach . . . . This is a clear effort by FetchIT to prolong the materially significant threat to Shodogg's business that Fetch's (sic) breach has caused and continues to cause. . . . FetchIT made clear that it is keeping its communications with Vizbee a secret . . . . That prolonged uncertainty and its associated materially significant threat to Shodogg is unacceptable . . . .[197]

As a result, Shodogg was "now notify[ing] FetchIT that . . . the [License Agreement] is hereby terminated effectively immediately."[198] By August 14, 2017, Shodogg had turned off FetchIT's access to the Shodogg platform and directed its employees to end work with FetchIT.[199]

On August 18, 2017, FetchIT's counsel sent a letter to Keller. FetchIT denied breaching the License Agreement and alleged that Shodogg had now breached the License Agreement by denying FetchIT access to Shodogg's platform.[200] FetchIT wrote that Siemonsma had written a single e-mail to Vizbee on July 10 "advising Vizbee that FetchIT ha[d] a license to the Shodogg Technology and the right to sublicense the Technology."[201] FetchIT then wrote that "No further communication

---

[196] Id.
[197] Id.
[198] Id.
[199] JX 72; JX 73.
[200] JX 77.
[201] Id.

37

has occurred between FetchIT and Vizbee."[202]  FetchIT then summarized the course of communication between FetchIT and Shodogg, highlighting that Shodogg had not proven that Vizbee is an actual infringer.[203]  However, FetchIT argued, even if Vizbee was shown to be an actual infringer, "no court would ever find [Siemonsma's] email constituted a material breach justifying termination of the [License] Agreement," as the e-mail was sent to Vizbee's general address, was merely a solicitation for a conversation, and was FetchIT's only communication with Vizbee.[204]  In FetchIT's eyes, Shodogg's allegation of material breach "looks like a thinly veiled attempt by Shodogg to attempt to manufacture a basis to terminate the [License] Agreement, because Shodogg clearly regretted granting FetchIT the sublicensing rights granted under [the Addendum]."[205]

Keller responded to FetchIT's August 18, 2017 letter on August 21.  In brief, Keller reiterated that in Shodogg's view FetchIT could not pursue opportunities with infringers of Shodogg's IP without prior Shodogg permission.[206]  Keller recognized that FetchIT was providing for the first time information on the scope of FetchIT's communications with Vizbee, however, Keller discounted such disclosure as late in time, which "placed a substantial and unnecessary risk on Shodogg."[207]  Keller noted

---

[202] *Id.*
[203] *Id.*
[204] *Id.*
[205] *Id.*
[206] JX 78.
[207] *Id.*

that Shodogg gave FetchIT ample time to cure FetchIT's breach, despite Shodogg's right under the License Agreement to require FetchIT to cure immediately.[208] Keller wrote that "to try and suggest that Shodogg is to blame for manufacturing an issue, when FetchIT was the cause of the material breach and had the means to cure it, is wholly improper."[209]

### 8. Shodogg Sues Vizbee, and Shodogg and Vizbee have one last meeting

On August 17, 2017, Shodogg filed a patent infringement suit against Vizbee in the United States District Court for the Southern District of New York.[210] On August 23, Feher and Mitschele met in person in New York.[211] Mitschele hoped Feher would offer some deal to avoid litigation.[212] Feher offered no deal; he testified his purpose in meeting with Mitschele was to gauge Mitschele's seriousness in pursuing the litigation.[213] In November 2017, Feher and Mitschele met informally for a final time in New York, and to Feher's surprise they were joined by Robert Burns, Shodogg's Chairman of the Board.[214] The meeting was brief, Feher had wanted to meet again to confirm Shodogg's commitment to litigation.[215] As Feher

---

[208] *Id.*
[209] *Id.*
[210] JX 74.
[211] JX 82; JX 83.
[212] Trial Tr. 424:3–425:16 (Mitschele).
[213] JX 104, at 130:18–131:14 (Feher); Trial Tr. 425:2–12 (Mitschele).
[214] JX 104, at 136:23–138:4 (Feher); Trial Tr. 429:8–430:18 (Mitschele).
[215] JX 104, at 138:23–139:7 (Feher).

was leaving the meeting, Burns mentioned FetchIT to Feher, and Feher in response told Burns and Mitschele that he had never responded to FetchIT's e-mail or otherwise communicated with FetchIT.[216] On November 28, 2017, Mitschele e-mailed Feher to thank him for the meeting and wrote "unfortunately, as you mentioned, that our discussions took a surprising turn due to the interference of our licensing partner. I understand that merging/licensing is now off the table . . . ."[217] Feher responded by e-mail with pleasantries. However, he did not address Mitschele's allegation that Feher had implied that the Vizbee-Shodogg negotiations were injured by FetchIT's interference.[218] In his testimony, Feher denied that this allegation was discussed during the November 27 meeting.[219]

*E. Procedural History*

This action was commenced on September 1, 2017. Along with their Complaint, the Plaintiffs filed a Motion for Preliminary Injunction and a Motion to Expedite. On September 11, 2017, I entered an Order Governing Expedited Proceedings. Pursuant to that order, the Defendants filed their Answer and Counterclaims on September 13, 2017. I denied the Motion for Preliminary Injunction at a Hearing on October 13, 2017. During the Hearing I agreed to

---

[216] JX 104, at 138:5–9 (Feher); Trial Tr. 430:19–431:8 (Mitschele).
[217] JX 96.
[218] *Id.*
[219] JX 104, at 142:10–143:9 (Feher).

entertain the Plaintiffs' request for a Status Quo Order. After letter arguments from both sides and a telephonic conference, I entered a Status Quo Order on February 28, 2018. A two-day trial then took place on July 25 and July 26, 2018. During the trial, I held an In-Chamber Conference and an In-Court Conference on the Plaintiffs' Objection to the admission of the testimony of Paul Keller. The parties waived Post-Trial Oral Argument, but did submit Post-Trial Briefing, which was completed on September 28, 2018.

## II. LEGAL ANALYSIS

Shodogg and FetchIT entered into a License Agreement in 2015 and their relationship was amicable until mid-2017. At that time, Shodogg faced financial difficulties, and Shodogg initiated a recapitalization of its business and began the transition to a business model based on licensing and IP litigation. With the foregoing in mind Shodogg and FetchIT negotiated an Addendum to their License Agreement intended to benefit both parties. However, the Addendum, together with a contemporaneous agreement regarding investment in Shodogg, only strained their relationship; not just professionally but also the personal relationship between their respective CEOs, which had been close. In August 2017, Shodogg terminated the License Agreement and cut off FetchIT's access to Shodogg's technology.

Plaintiffs FetchIT and Siemonsma initiated this litigation and brought a claim for breach of contract against Defendants Shodogg and Mitschele for terminating

41

the License Agreement. Shodogg and Mitschele in turn brought counter-claims, alleging that the Plaintiffs had breached the agreement and that the termination was proper. Trial was held to determine whether a breach by either party occurred, whether such breach was material, whether the License Agreement was properly terminated, and what relief would be appropriate for the non-breaching party.[220]

Because I find it dispositive, I turn first to Shodogg's counterclaim for breach of contract and declaratory judgment.

A. *Shodogg's Claim that the Termination was not a Breach of Contract*

Shodogg and Mitschele's counterclaim for breach of contract, in brief, is that Siemonsma's "to whom it may concern" e-mail to Vizbee was a breach of FetchIT's obligations in the License Agreement relative to the use of Shodogg's technology. Shodogg's counsel, Keller, wrote to FetchIT and shared his opinion that the breach created a bona-fide, materially significant threat to Shodogg. In the same letter, Keller demanded that FetchIT cure its breach and listed the ways, in Shodogg's view, FetchIT could do so. FetchIT refused to provide the cure that Shodogg requested—or, indeed, any cure—and Shodogg terminated the License Agreement. Shodogg

---

[220] The Plaintiffs' Complaint also included a claim for breach of contract against the Defendants for refusing to allow FetchIT and Siemonsma to participate in Shodogg's recapitalization and a claim for declaratory judgment that FetchIT was entitled to participate in the recapitalization. FetchIT also sought a declaratory judgment that Shodogg was winding down its business, which according to the Plaintiffs would entitle FetchIT to Shodogg's source code under the License Agreement. However, these three counts were absent from the issues listed for determination at trial in the Pre-Trial Stipulation and Order, and I consider them waived. *See* Pre-Trial Stipulation and Order at 2–3.

asks that I find FetchIT breached the License Agreement and that thereafter Shodogg properly terminated the Agreement.

### 1. Legal Standard

In order to demonstrate entitlement to the declaratory judgement they seek, Counterclaimants (the "Shodogg parties") must show, by a preponderance of the evidence, first, that the Counterclaim Defendants (the "FetchIT parties") breached the License Agreement,[221] and, next, that the Shodogg parties complied with the contractual predicates for termination.

### 2. FetchIT Breached the License Agreement by Sending the E-mail to Vizbee

The parties address in briefing their dispute as to the effect of the Addendum on FetchIT's rights, under the License Agreement, to sublicense Shodogg's Technology. The Addendum did not, however, change FetchIT's obligations relative to the use of Shodogg's technology found in Section 10 of the License Agreement. It was this Section that Shodogg alleged FetchIT breached by e-mailing Vizbee. The dispute over the extent of FetchIT's sublicensing rights provides useful context to the Shodogg-FetchIT relationship, but is not dispositive of the Shodogg parties' argument that FetchIT breached the License Agreement.

---

[221] To prevail on a breach of contract claim, a plaintiff must show: (1) a contractual obligation, (2) a breach of that obligation by the defendant, and (3) a resulting damage to the plaintiff. *Domain Assocs., L.L.C. v. Shah*, 2018 WL 3853531, at *9 (Del. Ch. Aug. 13, 2018).

Under Section 10.1 of the License Agreement, FetchIT agreed, in pertinent part, that, upon learning of infringement of Shodogg's technology rights, it would not "take any action on account of any such infringement without first obtaining the written consent of Shodogg."[222] The principal purpose of Section 10.1 appears to be to prevent FetchIT from bringing enforcement actions against third parties for use of Shodogg's IP, to which FetchIT had a license. Shodogg wanted to maintain control over enforcement of its IP rights, in pursuit of which the parties agreed to broad language, providing FetchIT would not take *any action* with respect to infringers of Shodogg's IP. As Siemonsma knew, Shodogg considered Vizbee to be an infringer. Nonetheless, in pursuit of the interest of the FetchIT parties, Siemonsma effectively undercut Shodogg's attempts to vindicate its rights, by sending the e-mail to Vizbee. Accordingly, per Shodogg, the FetchIT parties breached the License Agreement. I agree.

The FetchIT parties argue that Vizbee has not been shown to be an infringer, or at least that such was not proven to their satisfaction as of the time of the e-mail to Vizbee. Therefore, they say, Siemonsma's e-mail could not have breached the License Agreement. As an ancillary matter, Shodogg has since brought patent infringement litigation against Vizbee, this litigation, however, was not filed until after Siemonsma's e-mail. At the time of the e-mail, Siemonsma knew, at the very

---

[222] JX 1 § 10.1.

least, the following: (1) that Vizbee had competed with Shodogg for the business with Turner and won, (2) that Shodogg believed Vizbee was infringing on Shodogg's patents, (3) that Shodogg had legal representation and was considering patent infringement litigation, and (4) that Shodogg had sent a "cease and desist" letter to Vizbee. Such knowledge alone is sufficient to show that for purposes of Section 10 of the License Agreement Vizbee was an "infringer," and FetchIT therefore had an obligation not to "take any action on account of any such infringement."

The language of Siemonsma's e-mail to Vizbee is compelling. In that e-mail, Siemonsma informs Vizbee that he controls sub-licensing rights in the Shodogg technology, then states his desire "to discuss a partnership that would resolve *any issues* [Vizbee] currently ha[s] with Shodogg" and posits that he may be able to "help resolve *any potential issues* [Vizbee] may have with [Shodogg]."[223] Siemonsma was clearly referencing Shodogg's infringement claims against Vizbee. In other words, Siemonsma knew Shodogg believed Vizbee was infringing on Shodogg's technology rights, knew that Shodogg had demanded Vizbee cease such infringement via legal counsel, and—to the detriment of Shodogg's position—offered to "resolve [Vizbee's] . . . issues" through FetchIT's sublicensing rights. Siemonsma further asked that Vizbee keep his communication "confidential," that

---

[223] JX 43.

45

is, secret from Shodogg.[224]  I find that the FetchIT parties took an action with respect to a dispute over Shodogg's technology, in breach of the License Agreement.

To the extent that FetchIT argues that its obligation not to act or its obligation to cure were never triggered, because Shodogg failed to provide claim charts or other evidence of infringement to FetchIT, no such obligation exists in the contract, and the FetchIT parties, as recited above, were aware of, and attempting to exploit, the technology dispute at the time of breach.[225]  Similarly, the FetchIT parties argue that regardless of whether Vizbee was an "infringer" under Section 10 of the License Agreement, Siemonsma's e-mail was not an action *on account* of such infringement, but an action in furtherance of what FetchIT believed to be its contractual rights to sublicense Shodogg's IP.  As an initial matter, the e-mail could be both.  However, Siemonsma's e-mail is again dispositive.  Siemonsma states in the e-mail that he seeks to sublicense Shodogg's IP to Vizbee in order to help Vizbee resolve its issues, *i.e. Shodogg's patent infringement claims*, with Shodogg.[226]  Siemonsma's e-mail was a breach of contract.

---

[224] A request that Vizbee did not honor.

[225] The Plaintiffs claim that an interpretation of Section 10 allowing Shodogg to determine whether infringement was occurring, unilaterally, would have allowed Shodogg to make a pretextual allegation of infringement to stop FetchIT from pursuing sublicensing opportunities.  That hypothetical concern is neither pertinent nor plausible.

[226] The Shodogg parties also argue that in addition to being an "action taken on account of . . . infringement," the e-mail also breached FetchIT's obligation to "provide all possible assistance in any prosecution of such infringement which Shodogg may decide to institute." *See* JX 1 § 10.1. The FetchIT parties argue that "prosecution" duties arise only once formal legal action has been commenced.  Because I find a breach of the "any action" provision, I need not resolve this dispute.

46

### 3. Shodogg's Counsel Determined that FetchIT's Breach Created a "Bona-Fide, Materially Significant Threat to Shodogg's Business"

According to Section 11.2 of the License Agreement, there were three scenarios, following a breach, under which the non-breaching party could give notice and opportunity to cure, absent which it could terminate the License Agreement. In the case of a material breach, the breaching party was given sixty days after notice of default to cure. In the case that FetchIT defaulted on payment obligations, then FetchIT would have only ten days following notice of such default to cure. Finally, in the case that FetchIT breached its "obligations relative to the use of the Technology" and that breach "in the opinion of Shodogg's counsel create (sic) a bona-fide, materially significant threat to Shodogg's rights to the Technology or otherwise to Shodogg's business," FetchIT would have "fifteen (30) days or immediately if deemed incurable" to cure. This last scenario was invoked by Shodogg's counsel, Keller, in his July 14, 2017 letter to FetchIT.

In his July 14, 2017 letter to FetchIT, Keller wrote that Shodogg had learned that FetchIT, through Siemonsma, had e-mailed Vizbee in violation of FetchIT's obligation in Section 10 to not take "any action on account" of infringement. I have found above that the referenced e-mail did breach Section 10. Keller wrote that this breach "create[d] a bona-fide, materially significant threat to Shodogg's rights," and that his letter was meant to constitute notice "pursuant to Section 11.2 of the

47

[License] Agreement, of FetchIT's default."[227] Section 11.2 provides for Shodogg's rights to terminate the Agreement. Keller goes on in the letter to detail how he believes FetchIT could cure this default.

I have found that the FetchIT parties, in attempting to deal with Vizbee, were in breach of the duty to refrain from action regarding infringement on the Shodogg technology. This was a breach of its "obligations relative to its use of the Technology" under the License Agreement, triggering, upon a determination of materially significant threat, the fifteen day cure period. The FetchIT parties argue that sending the e-mail was not a material threat. The contractual right to demand cure, however, is triggered by a subjective finding by counsel of a "bona-fide, materially significant threat" to Shodogg's business, and such a finding was made and communicated to FetchIT by Shodogg.

The requirement that the finding be "bona fide" requires subjective good faith.[228] Briefly, and as set out in more detail below, the evidence is ample that the finding was in good faith. Shodogg was in financial difficulties. Among its limited valuable assets was its technology rights, and specifically a claim against Vizbee for infringement of those rights. Siemonsma's e-mail to Vizbee threatened to undercut

---

[227] JX 47.

[228] "Bona fide," of course, is simply legal Latin for "good faith." *E.g. Bona Fide*, Black's Legal Dictionary (10th ed. 2014). As our Supreme Court has found, a contractual obligation that one party make a determination in "good faith" provides a purely subjective standard, from the point of view of the determining party "as situated at the time. . . ." *DV Realty Advisor LLC v. Policemen's Annuity and Ben. Fund*, 75 A.3d 101, 109–111 (Del. 2013).

48

any value in this claim. I have found the e-mail was a breach; I also find in these circumstances it, and the offer it implied, were a material threat to Shodogg's business. To the extent that the FetchIT parties argue that the e-mail was not a "real" threat, because the evidence indicates that *Vizbee* did not take it seriously, that is immaterial to the contractual issues. The standard here is whether Shodogg and its counsel determined in good faith that FetchIT's action was a material threat; that is, a material threat from Shodogg's point of view *given its knowledge at the time the determination was made*.[229] The objective extent of the threat was hidden from Shodogg *due to FetchIT's intransigence*. Had FetchIT disclosed the extent of its communications with Vizbee and promised to refrain, as Shodogg demanded, not only might the termination not have occurred, but, at any rate, in this litigation FetchIT might argue, plausibly, that a finding of material threat was not bona fide. However, all Shodogg knew was that FetchIT was attempting to undercut Shodogg in a material dispute with Vizbee, and that FetchIT further refused to disclose the extent of the attempt.[230]

---

[229] *DV Realty Advisory*, 75 A.3d at 110.

[230] The FetchIT parties suggest that Shodogg should have asked *Vizbee* for the contents of the FetchIT e-mail and the extent of any discussions Vizbee was having with FetchIT, and thereby Shodogg could have learned that the objective extent of the threat was slight. That Shodogg *could* have asked Vizbee, its competitor and anticipated opponent in litigation, for this information is immaterial to the contractual dispute here between Shodogg and FetchIT. Furthermore, Shodogg reasonably believed that such a line of questioning would further weaken its bargaining position with Vizbee, as it would reflect a lack of awareness and control over its own IP. Additionally, Vizbee, unlike FetchIT, owed no legal obligation to Shodogg to provide such information, and there was no assurance that Vizbee would be truthful if it did.

To recapitulate, I find based on Keller's July 14, 2017 letter to FetchIT and the testimonies of Mitschele and Sivitilli that Shodogg and its counsel believed in good faith, and communicated to FetchIT, that Siemonsma's communication with Vizbee was a bona-fide, materially significant threat to Shodogg.[231] At the time Siemonsma e-mailed Vizbee, Shodogg had completed its recapitalization but its business prospects remained dire. Shodogg had no customer engagements and there were no longer any independent opportunities to pursue at Turner. Shodogg hoped that it could collaborate with Vizbee, which had won those Turner opportunities. Shodogg sought to use potential patent infringement litigation as leverage in its collaboration discussions with Vizbee, and in the alternative actually pursue such litigation. During the time that Shodogg was attempting to negotiate a collaboration with Vizbee and exert its patent infringement litigation leverage, Siemonsma contacted Vizbee offering to sublicense Shodogg's IP.

The Shodogg parties point out, and I find, that this sublicense offer poised two materially significant threats to Shodogg: first, the sublicense offer could disrupt

---

[231] Keller appeared as an advocate for the Defendants but later withdrew and testified as a fact witness at trial. The Plaintiffs have moved to strike Keller's testimony based on the possibility of overlap between his two roles. The Defendants contend that Rule 3.7(a) of the Delaware Rules of Professional Conduct was not violated as Keller withdrew as an advocate prior to trial, although Keller's involvement in pre-trial briefing is alleged. I do not rely on Keller's testimony at trial, nor his prior deposition, because the testimony of the principals of Shodogg and Keller's opinion as reflected in his contemporaneous written letters and e-mails to FetchIT provide sufficient factual support for my inquiry. As a result, I make no determination on the Plaintiffs' motion to strike nor do I reach questions such as those posed in *Oxbow*. *See In re Oxbow Carbon LLC Unitholder Litigation*, 2017 WL 3207155 (Del. Ch. July 28, 2017).

Shodogg's collaboration discussions with Vizbee by weakening Shodogg's leverage; second, the sublicense offer could disrupt Shodogg's planned patent infringement litigation against Vizbee, if collaboration discussions came to naught.[232] That is not to say that Shodogg's principals were unaware that the negotiation with Vizbee were uncertain even absent the breach. Their testimony reflects, at best, a cautious optimism about reaching a deal on a collaboration.[233] What both Shodogg and Vizbee understood was that Shodogg's only leverage with, and value to, Vizbee was Shodogg's IP. From Shodogg's perspective, if Vizbee believed, as a result of FetchIT's offer, that Vizbee could avoid or prevail in a patent infringement suit brought by Shodogg, it would have even less incentive to collaborate with Shodogg. Similarly, if Vizbee believed that it could obtain IP rights important to its business, rights to IP it had been improperly using, from *FetchIT*, it was unlikely to reach a deal favorable to Shodogg concerning those rights. Therefore, FetchIT's e-mail offer of a sublicense to Vizbee could have the

---

[232] I note that Keller testified that these were the threats he foresaw when he wrote the July 14, 2017 letter. However, these threats are readily inferable from the letter and evidence presented at trial, therefore, I need not rely on his testimony.

[233] The FetchIT parties argue that Shodogg failed to comply with Section 15.7 of the License Agreement whereby Shodogg "agrees it will give notice to FetchIT if it intends to sell its business or the Technology and to negotiate in good faith with FetchIT for a period of thirty (30) days for FetchIT to purchase Shodogg's business or the Technology." JX 1 §15.7. As a result, the FetchIT parties contend that the doctrines of unclean hands and equitable estoppel should prevent Shodogg from terminating the Agreement. However, collaboration discussions were not only uncertain but were also in early stages, too early to determine whether the prospective collaboration would be a sale. Therefore, the requirements of Section 15.7 did not apply.

immediate effect of ending or weakening discussions between Shodogg and FetchIT.[234] This was a materially significant threat to Shodogg, which, again, had few business prospects outside a collaboration with Vizbee.

Having found that FetchIT breached the License Agreement and Shodogg made the appropriate determination of default, I turn next to whether Shodogg properly provided opportunity to cure and whether FetchIT cured within the appropriate time.

### 4. Shodogg Properly Offered FetchIT an Opportunity to Cure and When FetchIT Did Not Cure, Shodogg Properly Terminated the License Agreement

According to the License Agreement, FetchIT could cure the default identified by Shodogg within "fifteen (30)" days, or immediately if the default was incurable. Keller's July 14, 2017 letter demands that FetchIT cure its default, and explains how. While Keller asked for immediate cure in some respects, Shodogg did not purport to terminate the License Agreement immediately. Therefore, Shodogg did not consider the default incurable and the License Agreement thus provided FetchIT "fifteen (30)" days to cure. The written and numerical terms are, obviously, in conflict. The record is devoid of evidence to resolve this ambiguity,[235] and I adopt the general rule

---

[234] This is true even if—as Shodogg maintains and FetchIT disputes—FetchIT does not have the unilateral right to sublicense to third parties.

[235] With the exception of the self-serving testimony of Siemonsma that he would "never" have agreed to a fifteen day cure period. Trial Tr. at 56:7–57:8 (Siemonsma). I find this testimony entirely unconvincing.

that the written number controls, it being less likely that a drafting error will occur in a written expression than a numeric one. I note that Delaware has adopted this rule in its Commercial Code, which I find persuasive here.[236] As a result, FetchIT had fifteen days following the Keller letter in which to cure.[237]

Shodogg knew when it sent the notice of breach that Siemonsma had been in communication, at least once, with Vizbee, and had offered to sublicense Shodogg's technology. This offer came in the context of ongoing discussions between Shodogg and Vizbee, in which Shodogg was attempting to prevent or leverage Vizbee's infringement of that technology. Shodogg requested as cure for this breach of the License Agreement that FetchIT confirm that its only communication with Vizbee

---

[236] Under the Uniform Commercial Code I note that analogous ambiguities are resolved under 6 Del. C. § 3-114 "words prevail over numbers." *See also* U.C.C. § 3-114, ("words prevail over numbers"); *see e.g. Duvall v. Clark*, 158 S.W.2d 565, 567 (Tex. Civ. App. 1941) (restating the "elementary" common law rule that "the written words of an instrument control and prevail over figures."). The Plaintiffs point out that this is a general rule of interpretation which is not applicable where parties intend for the numerical form to prevail over the written. The Plaintiffs contend that such is the case here, evidenced by Section 15.8 and Schedule C of the License Agreement which refer to a time period of days using only the numerical form. However, the fact that the parties chose in one instance to use only the numerical form says nothing of their intent when the written and numerical form are in conflict. As a result, I apply the general rule.

[237] In briefing, FetchIT suggests that using the written "fifteen" day cure period would be "highly prejudicial" to FetchIT. Under the facts here, that argument is unpersuasive. Shodogg sent its letter giving FetchIT notice of breach and opportunity to cure on July 14, 2017. What followed was not a diligent attempt to cure by FetchIT, in the mistaken belief that it had thirty days to do so, only to have its attempt frustrated by Shodogg's termination of the contract a few days early. To the contrary, FetchIT explicitly repudiated its duty to cure. In responses to Shodogg, FetchIT characterized its offer to Vizbee as an exercise of its right to sublicense, and stated that this was a right "FetchIT intends to exercise" going forward. It refused to share its "communications with Visbee." FetchIT's counsel told Shodogg that he had spoken to Siemonsma and that he was "unwilling to disclose FetchITs discussions or intentions regarding Visbee at this time." It was not until August 18, 2017, after the termination, that FetchIT disclosed the fact that its contact with Vizbee was limited to a single email.

had been Siemonsma's e-mail, that no further communications with Vizbee would take place, and that FetchIT turn over the e-mail and any other communications with other potential infringers. FetchIT flatly refused.

FetchIT's response was that it was not required to disclose such communications, and it refused to give assurances that communication with Vizbee had ceased. In fact, FetchIT had not, and did not, have further communications with Vizbee. The FetchIT parties now argue that the lack of further communication cured their breach. However, FetchIT's cryptic restraint cannot have cured the materially significant threat posed to Shodogg, because FetchIT did not share the lack of further communication with Shodogg. Shodogg was therefore justified in believing that FetchIT may be in continued talks with Vizbee to sublicense Shodogg's IP, which was the materially significant threat. In fact, FetchIT alleged a right to continue to deal with Vizbee, and made it appear as though it would continue to breach. Moreover, by refusing to turn over its communication with Vizbee, and by implying that there were multiple communications, FetchIT undercut any ability of Shodogg to devise a strategy to negotiate with Vizbee. I find that as of the time of termination, FetchIT had refused to cure the breach.

After more than fifteen days, Shodogg terminated the License Agreement on August 11, 2017.[238] Only after the termination did FetchIT attempt to provide the necessary assurance that it had ceased with communication Vizbee. I find that Shodogg gave FetchIT the contractually required cure period of fifteen days, FetchIT did not cure its breach within this time, and Shodogg's termination of the License Agreement was therefore contractually proper.[239]

*B. FetchIT's Breach of Contract Claim*

FetchIT's breach of contract claim stems from Shodogg's termination of the License Agreement on August 11, 2017. As I have found above, that termination was no breach.[240] The relief sought by the Plaintiffs is therefore denied.

---

[238] FetchIT was entitled to a fifteen day cure period after notice. The FetchIT parties in post-trial briefing argue that Section 15.8 of the License Agreement governs notice. Under Section 15.8 notice is "deemed effective upon the earliest to occur of (i) actual delivery, . . . or (iv) 5 days after dispatch by courier service." JX 1 § 15.8. FetchIT's legal counsel responded to Keller's July 14, 2017 letter, which alleged breach and requested cure, on July 19, 2017. Clearly there was actual delivery by at least July 19, from which August 11 is more than fifteen days. Shodogg also sent Keller's July 14 letter by courier to FetchIT on July 21, which according to Section 15.8 would mean notice was effective by at least July 26, from which August 11 is still more than fifteen days. *See* JX 70.

[239] To the extent FetchIT relies on the affirmative defenses of unclean hands, estoppel or breach of contract excusing performance, including in relation to Shodogg's termination of free technical support, these defenses, to the extent not waived, are meritless.

[240] The Shodogg parties raise the affirmative defense of unclean hands in response to FetchIT's breach of contract claim. Given my decision, that defense is moot.

*C. Shodogg Has Not Shown Bad Faith*

Shodogg seeks its fees and costs in this litigation under the bad faith exception to the American Rule. However, I find no bad faith, and I therefore reject Shodogg's request for fees.

### III. CONCLUSION

For the forgoing reasons, I find that the Defendants did not breach the License Agreement. Rather, as the Defendants counterclaimed, the Plaintiffs breached the License Agreement and the Defendants thereafter properly terminated the Agreement. The Defendants are entitled to declaratory judgment on the counterclaim. The parties should provide an appropriate form of order.